**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY NIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1391 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| R.B. GUSTAFSON COMPANY, | ) | |
| | ) | Magistrate Judge Ashman |
| Defendant. | ) | |

**JOINT JURISDICTIONAL STATUS REPORT**

Plaintiff Jeffrey Nixon ("Plaintiff"), through his attorneys Michael Ciesla  and Defendant

R. B. Gustafson Company ("Defendant"), through its attorney James C. Vlahakis submit their

Joint Jurisdictional Status Report pursuant to the Court's Standing Order.

**I.**    **Subject Matter Jurisdiction (Diversity Jurisdiction)**

**1.**    **Nature of Lawsuit.**  Plaintiff alleges breach of an employment agreement

between the Plaintiff and Defendant whereby Defendant failed to provide certain obligations and

severance payments pursuant to such employment agreement.  There are no counterclaims at this

time.

**2.**    **Diversity Jurisdiction.**  This case was removed by Defendant on March 7, 2008,

pursuant to 28 U.S.C. § 1332 and 28 U.S. C. § 1441(c).  As Defendant was served on or about

February 7, 2008, removal was timely under 28 U.S. C. § 1446(b).

The basis for removal is a follows:  (a) Plaintiff is currently and was a citizen of Illinois

during the events at issue which took place between January 2005 and January 2008; (b)

Defendant is and was incorporated in the State of Indiana during the events at issue which took

place between January 2005 and January 2008; (c) Defendant's principal place of business is and

was located in Elkhart, Indiana, during the events at issue which took place between January

2005 and January 2008; and (d) the amount which Plaintiff claims he is owed pursuant to terms

of an employment agreement is approximately $200,000.  *See* Exhibit A (Verified Complaint);

Exhibit B (Senior Management Agreement); Exhibit C (State of Indiana, Secretary of State print-

out); Exhibit D (2007 copyrighted material posted on Defendant's website, printed on March 7,

2008).

In particular, Plaintiff's Verified Complaint (Exhibit A) provides that he was a citizen of

Illinois during the time period of the events at issue (2005-2008) and that Defendant is and was

incorporated in the State of Indiana during the events at issue.  *Id*. at p. 1, ¶¶ 1-2.  Additionally

the 2005 Senior Management Agreement (Exhibit B), identifies Plaintiff's home address in

Vernon Hills, Illinois, and provides that Defendant is an Indiana corporation.  *Id*. at pp. 1, 14.   It

also provides that Plaintiff is entitled to $200,000 if certain conditions are met.  *Id*. at pp. 6-8

Exhibit C demonstrates that Defendant is an Indiana incorporation.  Finally, Exhibit D identifies

Defendant's company history in Elkhart, Indiana.  *See also*, Exhibit A, Verified Complaint

signed by Plaintiff; Exhibit E, affidavit of attorney James C. Vlahakis (demonstrating that

Defendant was an Indian Corporation with a principal place of business in Elkhart, Indiana,

during the years 2005-08).

Plaintiff agrees that removal was proper and has not moved for remand.

For these reasons, removal was proper under 28 U.S.C. §§ 1332(a)(1) and (c)(1).

## II.   <u>Venue (Plaintiff's Position)</u>[1]

Venue is proper in this district as the conversation which led to the dispute as to

Plaintiff's alleged termination took place in this district and the individuals involved in the

conversation work or reside in this district.  Further, as a general matter, board meetings with

---

[1]      While this report was prepared by both parties, the representations below are those of Plaintiff
and are not binding against Defendant as to the merits of this case.

6307893v1 887376

Plaintiff and various individuals affiliated with Defendant took place in Chicago, Illinois. Further, the Senior Management Agreement which is at issue in this case was executed in Illinois and the terms of the agreement provide that Illinois law governs interpretations of the agreement.

Respectfully Submitted,


/s/ E. Michael Ciesla                    /s/ James C. Vlahakis
E. Michael Ciesla                        James C. Vlahakis
Ciesla & Ciesla, P.C.                    Hinshaw & Culbertson LLP
836 Skokie Blvd.                         222 N. LaSalle Street, Suite 300
Northbrook, Illinois 60062               Chicago, Illinois 60601
(847) 412-1988                           (312) 704-3715
mciesla@cclegal.net                      jvlahakis@hinshawlaw.com


Attorneys for Plaintiff                  Attorneys for Defendant

6307893v1 887376

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2008 I electronically filed the above document with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

Respectfully Submitted,

/s/ James C. Vlahakis
James  C. Vlahakis
Hinshaw & Culbertson LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601
 (312) 704-3715
jvlahakis@hinshawlaw.com
Attorney for Defendant

6307893v1 887376

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY NIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1391 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| R.B. GUSTAFSON COMPANY, | ) | |
| | ) | Magistrate Judge Ashman |
| Defendant. | ) | |

**<u>Appendix of Exhibits in Support of Joint Jurisdictional Report</u>**


A.     Complaint

B.     Senior Management Agreement

C.     Indiana Secretary of State Website Company Listing for R.B. Gustafson

D.     Website Homepage for R.B. Gustafson

E.     Declaration of Attorney James C. Vlahakis




<u>/s/ James C. Vlahakis</u>
James  C. Vlahakis
Hinshaw & Culbertson LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601
 (312) 704-3715
jvlahakis@hinshawlaw.com
Attorney for Defendant

Exhibit A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

JEFFREY NIXON,                                )
                                              )
              Plaintiff,                      )
                                              )
      v.                                      )        No.:
                                              )
R.B. GUSTAFSON COMPANY,                       )      **08L001049**
an Indiana corporation,                       )
                                              )
              Defendant.                      )

## VERIFIED COMPLAINT AT LAW

NOW COMES the Plaintiff, JEFFREY NIXON, by and through his attorneys,

CIESLA & CIESLA, P.C., and LAW OFFICES OF CARY N. GOLDBERG and for his

complaint against the Defendant, R.B. GUSTAFSON COMPANY, alleges as follows:

1.      Plaintiff JEFFREY NIXON is an individual and was at all relevant times a

resident of the State of Illinois and is currently a resident of the Village of Northbrook,

County of Cook, State of Illinois.

2.      Defendant R.B. GUSTAFSON COMPANY is an Indiana corporation

which does business nationwide including Illinois.  Defendant is in the business of

providing lighting products to the RV and manufactured housing industry.

3.      At all relevant times, Mr. Josh Daitch was a director and the chairman of

the board of the Defendant.

4.      At all relevant times, Mr. Dan Howell was a board member of the

Defendant.

5.      On or about January 26, 2005, the Plaintiff entered into a Senior

Management Agreement with the Defendant, Gustafson Holdings Corp., a Delaware

corporation and Mesirow Capital Partners VIII, L.P. (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit A and made a part hereof.

6.      The Employment Agreement had a term of three (3) years expiring January 26, 2008.

7.      On or about January 4, 2008, Plaintiff met with Mr. Josh Daitch and Mr. Dan Howell, at Mr. Daitch's office in Chicago, Illinois.

8.      At that meeting, Mr. Daitch informed the Plaintiff that his employment under the Employment Agreement was terminated pursuant to a vote by the Board of Directors of the Defendant. During that meeting, the Plaintiff was also instructed by Mr. Josh Daitch to prepare an exit memorandum to aid in the transition of certain business activities of the Plaintiff. Mr. Josh Daitch also instructed the Plaintiff to return the next day, January 5, 2008 to clean out his office.

9.      On January 5, 2008, the Plaintiff, under the supervision of Ms. Heather Smith, the Human Resources manager of the Defendant, cleaned out his office.

10.     The termination of Plaintiff's employment was without "Cause", as the definition of "Cause" is set forth in Section 9 of the Employment Agreement and Plaintiff was not terminated for any of the reasons listed in the definition of "Cause" in Section 9 of the Employment Agreement.

11.     Section 6(d) of the Employment Agreement states in relevant part:

"If the Executive's [Plaintiff's] employment is terminated by the Company [Defendant] without Cause, then during the 12 month period commencing on the date of termination, the Company shall pay the Executive at a rate equal to Executive's Annual Base Salary, payable in equal installments on the Company's regular salary payment dates . . . and allow the Executive to continue participating in all of the Company's

medical, disability and life insurance plans on the same basis as he was participating prior to termination . . .''

12.    Despite repeated demands by Plaintiff for payment of the annual base salary and for the continuation of participation in the Defendant's medical, disability and life insurance plans pursuant to Section 6(d) of the Employment Agreement, Defendant has, in breach of the Employment Agreement, refused to remit such payments or continue Plaintiff's participation in the medical, disability and life insurance plans.

13.    As a result of Defendant's breaches, Plaintiff has suffered damages including but not limited to the unpaid annual base salary of approximately $200,000.00 and the costs incurred by Plaintiff to continue medical, disability and life insurance.

14.    In addition, pursuant to section 11(g) of the Employment Agreement, Plaintiff may recover damages and costs (including attorney's fees) caused by any breach of any provision of the Employment Agreement and to exercise all other rights existing in his favor.

WHEREFORE, Plaintiff JEFFREY NIXON, request that this Honorable Court:

A.    Enter judgment in favor of Plaintiff JEFFREY NIXON and against Defendant R.B. GUSTAFSON COMPANY for all unpaid base salary and the cost of medical, disability and life insurance, which amount is in excess of $200,000.00, plus attorneys' fees and costs; and

3

B.    Grant Plaintiff such other relief as this Honorable Court deems equitable

and just.

JEFFREY NIXON

By: _____

One of his attorneys

E. Michael Ciesla
CIESLA & CIESLA, P.C.
707 Skokie Blvd.
Suite 220
Northbrook, Illinois 60062
(847) 412-1988
Attorney Number 42137

Cary N. Goldberg
LAW OFFICES OF CARY N. GOLDBERG
332 S. Michigan Avenue
Suite 1000
Chicago, Illinois 60604
(312) 356-9009
Attorney Number 33014

4

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that he is the Plaintiff in this cause, that he has read the foregoing Verified Complaint at Law, that the statements set forth in therein are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

_____
Jeffrey Nixon

5

## RULE 222(b) AFFIDAVIT

The undersigned, being first duly sworn upon his oath, deposes and says:

1.    I am an adult resident of Cook County, Illinois, and under no legal disability.

2.    I am the Plaintiff in the above-captioned lawsuit.

3.    That the total money damages sought by Plaintiff in the above-captioned lawsuit, exclusive of interest and costs, exceeds $50,000.00.

Further Affiant sayeth naught.

_____
Jeffrey Nixon

Subscribed and sworn to before me
this 21 day of JANUARY , 2008.

_____
Notary Public

```
"OFFICIAL SEAL"
Kimberly A. Rouzan
Notary Public, State of Illinois
My Commission Exp. 10/31/2009
```

6

Exhibit B

## SENIOR MANAGEMENT AGREEMENT

THIS SENIOR MANAGEMENT AGREEMENT (this "Agreement") is made as of January 26 , 2005, by and among Gustafson Holdings Corp., a Delaware corporation (the "Parent"), R.B. Gustafson Company, an Indiana corporation (the "Company") and Jeffrey Nixon (the "Executive"). Certain definitions are set forth in Section 9 of this Agreement.

### RECITALS

WHEREAS, the Company is a wholly owned subsidiary of the Parent;

WHEREAS, the Parent has adopted and filed with the Secretary of State of the State of Delaware a Certificate of Incorporation (the "Certificate of Incorporation") authorizing the issuance of shares of Common Stock, no par value (the "Common Stock") and shares of Class A Preferred Stock, no par value (the "Preferred Stock");

WHEREAS, Mesirow Capital Partners VIII, L.P.("Mesirow") owns 400,000 shares of Common Stock and 36,000 shares of Preferred Stock, and as such, is the majority shareholder of the Parent; and

WHEREAS, the parties desire to enter into this Agreement pursuant to which, among other things, the Executive will (i) purchase 36,000 shares of Common Stock from the Parent and 3,240 shares of Preferred Stock from the Parent and (ii) agree to be employed by the Company, in accordance with the terms, and subject to the conditions, set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

### ARTICLE I

### PROVISIONS RELATING TO EXECUTIVE STOCK

1.  Purchase and Sale of Executive Stock.

(a)     Upon execution of this Agreement, the Executive will purchase, and the Parent will sell, 36,000 shares of Common Stock at a price of $1 per share and 3,240 shares of Preferred Stock at a price of $100 per share. The Parent will deliver to the Executive copies of, and a receipt for, the certificates representing such Executive Stock, and the Executive will deliver to the Parent a promissory note in the form of Annex A attached hereto (the "Executive Note") in the principal amount of $310,000. The Executive's obligations under the Executive Note shall be secured by a pledge of 3,240 shares of Preferred Stock, each constituting a portion of the Executive Stock to the Parent and in connection therewith, the Executive shall enter into a pledge agreement in the form of Annex B attached hereto.

(b)     Until the occurrence of a Sale of the Parent or a Public Offering, all certificates evidencing shares of Executive Stock shall be held by the Parent for the benefit of the

CHI\192062.5

Executive and the other holder(s) of Executive Stock.  Upon the occurrence of a Sale of the Parent or of a Public Offering, the Parent will return the certificates for the Executive Stock to the record holders thereof.

(c)    In connection with the purchase and sale of the Executive Stock hereunder, the Executive represents and warrants to the Parent that:

(i)    The Executive Stock to be acquired by the Executive pursuant to this Agreement will be acquired for the Executive's own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act, or any applicable state securities laws, and the Executive Stock will not be disposed of in contravention of the Securities Act or any applicable state securities laws.

(ii)    The Executive is an executive officer of the Company, is sophisticated in financial matters and is able to evaluate the risks and benefits of the investment in the Executive Stock.

(iii)    The Executive is able to bear the economic risk of his investment in the Executive Stock for an indefinite period of time because the Executive Stock has not been registered under the Securities Act and, therefore, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.

(iv)    The Executive has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of Executive Stock and has had full access to such other information concerning the Parent and Company as he has requested.

(v)    This Agreement constitutes the legal, valid and binding obligation of the Executive, enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by the Executive does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which the Executive is a party or any judgment, order or decree to which the Executive is subject.

(vi)    The Executive is a resident of the State of Illinois.

(d)    Concurrently with the execution of this Agreement, the Executive shall execute in blank stock transfer powers in the form of Annex C attached hereto (the "Stock Powers") with respect to the Executive Stock being pledged under the Pledge Agreement and shall deliver such Stock Powers to the Parent.  The Stock Powers shall authorize the Parent to assign, transfer and deliver the shares subject to such Stock Powers to the Parent in the event the shares of Executive Stock are repurchased by the Parent or Mesirow pursuant to Section 3 below and under no other circumstances.

2.    [Intentionally Omitted.]

3.    Repurchase Option.

CH1\192062.5                                    2

(a)    In the event the Executive ceases to be employed by the Company for any reason (each a "Termination"), the Executive Stock (whether held by the Executive or one or more of the Executive's transferees) will be subject to repurchase, in each case by the Parent and Mesirow pursuant to the terms and conditions set forth in this Section 3 (the "Repurchase Option"). The parties hereto acknowledge and agree that the Company and the Parent may from time to time be restricted from exercising their respective rights under this Agreement by the provisions of that certain Credit Agreement dated of even date herewith by and among the Company, the Parent, Gustafson Acquisition Corp., a Delaware corporation and Capital Source Finance, LLC.

(b)    In the event of Termination for Cause the purchase price for each share of Executive Stock will be the lesser of (x) the Executive's Original Cost for such share, and (y) the Fair Market Value for such share. In the event of Termination due to (i) retirement from the Company after the age of 60 or (ii) the death or Disability of the Employee, the purchase price for each share of Executive Stock will be the Fair Market Value of such share. In the event of Termination for any reason other than for Cause or the reasons set forth in the immediately preceding sentence, the purchase price for each share of Executive Stock will be an amount equal to the Book Value per share as indicated on the most recent financial statement of the Company discounted by 20%, subject to the Company's Certificate of Incorporation.

(c)    The Parent's board of directors (the "Parent Board") may elect to purchase all or any portion of any class of the shares of Executive Stock by delivering written notice (the "Repurchase Notice") to the holder or holders of the Executive Stock within six months after the Termination. The Repurchase Notice will set forth the number of shares of each class to be acquired from each holder, the aggregate consideration to be paid for such shares and the time and place for the closing of the transaction.

(d)    If for any reason the Parent does not elect to purchase all of the Executive Stock pursuant to the Repurchase Option, Mesirow shall be entitled to exercise the Repurchase Option for the shares of Executive Stock the Parent has not elected to purchase (the "Available Shares"). As soon as practicable after the Parent has determined that there will be available Shares, but in any event within six months after the Termination, the Parent shall give written notice (the "Option Notice") to Mesirow setting forth the number of Available Shares and the purchase price for the Available Shares. Mesirow may elect to purchase any or all of the Available Shares by giving written notice to the Parent within 30 days after the Option Notice has been given by the Parent. As soon as practicable, and in any event within ten days, after the expiration of the 30-day period set forth above, the Parent shall notify each holder of Executive Stock as to the number of shares being purchased from such holder by Mesirow (the "Supplemental Repurchase Notice"). At the time the Parent delivers the Supplemental Repurchase Notice to the holder(s) of Executive Stock, the Parent shall also deliver written notice to Mesirow setting forth the number of shares Mesirow is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction.

(e)    The closing of the purchase of the Executive Stock pursuant to the Repurchase Option shall take place on the date designated by the Parent in the Repurchase Notice or Supplemental Repurchase Notice, which date shall not be more than 30 days nor less than five days after the delivery of the later of either such notice to be delivered. The Parent will

pay for the Executive Stock to be purchased by it pursuant to the Repurchase Option by first offsetting amounts outstanding under any bona fide debts owed by the Executive to the Parent (including, but not limited to, the Executive Note). Mesirow will pay the Executive Stock to be purchased by it pursuant to the Repurchase Option by delivery of a check or wire transfer of funds in the aggregate amount of the purchase price for such shares. The Parent and Mesirow will be entitled to receive customary representations and warranties from the sellers as to title and authority, and to require all sellers' signatures be guaranteed.

    4.    <u>Restrictions on Transfer of Executive Stock</u>.

    (a)    <u>Retention of Executive Stock</u>. The Executive shall not sell, transfer, assign, pledge or otherwise dispose of any interest in any shares of Executive Stock, except as expressly set forth in Section 4(b).

    (b)    <u>Transfer of Executive Stock</u>. Subject to Section 4(a) above, the Executive shall not Transfer any interest in any shares of Executive Stock, except pursuant to (i) the provisions of Section 3 hereof, a Public Offering or a Sale of the Parent ("<u>Exempt Transfers</u>") or (ii) the provisions of this Section 4; provided that in no event shall any Transfer of Executive Stock pursuant to this Section 4 be made for any consideration other than cash payable upon consummation of such transfer. Prior to making any Transfer other than an Exempt Transfer, the Executive will give written notice (the "<u>Sale Notice</u>") to the Parent and Mesirow. The Sale Notice will disclose in reasonable detail the identity of the prospective transferee(s), the number of shares to be transferred and the terms and conditions of the proposed transfer. The Executive will not consummate any Transfer until 120 days after the Sale Notice has been given to the Parent and Mesirow, unless the parties to the Transfer have been finally determined pursuant to this Section 4 prior to the expiration of such 120-day period. (The date of the first to occur of such events is referred to herein as the "<u>Authorization Date</u>").

    (c)    <u>First Refusal Rights</u>. The Parent may elect to purchase all (but not less than all) of the shares of Executive Stock to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to the Executive and Mesirow within 60 days after the Sale Notice has been given to the Parent. If the Parent has not elected to purchase all of the Executive Stock to be transferred, Mesirow may elect to purchase all of the shares of Executive Stock specified in the Sale Notice, the Executive may transfer the shares of Executive Stock specified in the Sale Notice, subject to the provisions of Section 4(d) below, at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the 60-day period immediately following the Authorization Date. Any shares of Executive Stock not transferred within such 60-day period will be subject to the provisions of this Section 4(c) upon subsequent transfer. The Parent may pay the purchase price for such shares by offsetting amounts outstanding under any bona fide debts owed by the Executive to the Parent.

    (d)    <u>Certain Permitted Transfers</u>. The restrictions contained in this Section 4 will not apply with respect to (i) transfers of shares of Executive Stock pursuant to applicable laws of descent and distribution or (ii) transfer of shares of Executive Stock among the Executive's Family Group; provided that such restrictions will continue to be applicable to the

pay for the Executive Stock to be purchased by it pursuant to the Repurchase Option by first offsetting amounts outstanding under any bona fide debts owed by the Executive to the Parent (including, but not limited to, the Executive Note). Mesirow will pay the Executive Stock to be purchased by it pursuant to the Repurchase Option by delivery of a check or wire transfer of funds in the aggregate amount of the purchase price for such shares. The Parent and Mesirow will be entitled to receive customary representations and warranties from the sellers as to title and authority, and to require all sellers' signatures be guaranteed.

4.    Restrictions on Transfer of Executive Stock.

(a)    Retention of Executive Stock. The Executive shall not sell, transfer, assign, pledge or otherwise dispose of any interest in any shares of Executive Stock, except as expressly set forth in Section 4(b).

(b)    Transfer of Executive Stock. Subject to Section 4(a) above, the Executive shall not Transfer any interest in any shares of Executive Stock, except pursuant to (i) the provisions of Section 3 hereof, a Public Offering or a Sale of the Parent ("Exempt Transfers") or (ii) the provisions of this Section 4; provided that in no event shall any Transfer of Executive Stock pursuant to this Section 4 be made for any consideration other than cash payable upon consummation of such transfer. Prior to making any Transfer other than an Exempt Transfer, the Executive will give written notice (the "Sale Notice") to the Parent and Mesirow. The Sale Notice will disclose in reasonable detail the identity of the prospective transferee(s), the number of shares to be transferred and the terms and conditions of the proposed transfer. The Executive will not consummate any Transfer until 120 days after the Sale Notice has been given to the Parent and Mesirow, unless the parties to the Transfer have been finally determined pursuant to this Section 4 prior to the expiration of such 120-day period. (The date of the first to occur of such events is referred to herein as the "Authorization Date").

(c)    First Refusal Rights. The Parent may elect to purchase all (but not less than all) of the shares of Executive Stock to be transferred upon the same terms and conditions as those set forth in the Sale Notice by delivering a written notice of such election to the Executive and Mesirow within 60 days after the Sale Notice has been given to the Parent. If the Parent has not elected to purchase all of the Executive Stock to be transferred, Mesirow may elect to purchase all of the shares of Executive Stock specified in the Sale Notice, the Executive may transfer the shares of Executive Stock specified in the Sale Notice, subject to the provisions of Section 4(d) below, at a price and on terms no more favorable to the transferee(s) thereof than specified in the Sale Notice during the 60-day period immediately following the Authorization Date. Any shares of Executive Stock not transferred within such 60-day period will be subject to the provisions of this Section 4(c) upon subsequent transfer. The Parent may pay the purchase price for such shares by offsetting amounts outstanding under any bona fide debts owed by the Executive to the Parent.

(d)    Certain Permitted Transfers. The restrictions contained in this Section 4 will not apply with respect to (i) transfers of shares of Executive Stock pursuant to applicable laws of descent and distribution or (ii) transfer of shares of Executive Stock among the Executive's Family Group; provided that such restrictions will continue to be applicable to the

4

Executive Stock after any such transfer and the transferees of such Executive Stock have agreed in writing to be bound by the provisions of this Agreement.

(e)     Termination of Restrictions.  The restrictions on the Transfer of shares of Executive Stock set forth in this Section 4 will continue with respect to each share of Executive Stock until the date on which such Executive Stock has been transferred in a transaction permitted by this Section 4 (except in a transaction contemplated by Section 4(d)); provided that in any event such restrictions will terminate on the first to occur of a Sale of the Parent or a Public Offering.

5.      Additional Restrictions on Transfer of Executive Stock.

(a)     Legend.  The certificates representing the Executive Stock will bear a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED AS OF JANUARY ___, 2005, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS OR TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN A SENIOR MANAGEMENT AGREEMENT AMONG GUSTAFSON HOLDINGS CORP., R.B. GUSTAFSON COMPANY AND JEFFREY NIXON DATED AS OF JANUARY ___, 2005.  A COPY OF SUCH AGREEMENT MAY BE OBTAINED BY THE HOLDER HEROF AT GUSTAFSON HOLDINGS CORP.'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)     Opinion of Counsel.  No holder of Executive Stock may sell, transfer or dispose of any Executive Stock (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Parent an opinion of counsel (reasonably acceptable in form and substance to the Parent) that neither registration nor qualification under the Securities Act and applicable state securities laws is required in connection with such transfer.  In addition, if the holder of the Executive Stock delivers to the Parent an opinion of such counsel that no subsequent transfer of such Executive Stock shall require registration under the Securities Act, the Parent shall promptly upon such contemplated transfer deliver new certificates for such Executive Stock which do not bear the first sentence of the legend set forth above.  If the Parent is not required to deliver new certificates for such Executive Stock not bearing such legend, the holder thereof shall not transfer the same until the prospective transferee has confirmed to the Parent in writing its agreement to be bound by the conditions contained in this Section 5.

ARTICLE II

5

## PROVISIONS RELATING TO EMPLOYMENT

6.      Employment.

    (a)    Position and Duties.  The Company agrees to employ the Executive as Chief Executive Officer of the Company, and the Executive accepts such employment and agrees to act as Chief Executive Officer of the Company, all in accordance with the terms of this Agreement.  Executive shall report to and be subject to the direction of the Board of Directors of the Company (the "Company Board").  Executive shall perform and discharge such duties and responsibilities for the Company as the Company Board may from time to time reasonably assign Executive.  Executive understands and acknowledges that such duties shall be subject to revision and modification by the Company Board.  During the Employment Period, Executive shall devote Executive's full business time, attention, skill and efforts to the faithful performance of Executive's duties herein, and shall perform the duties and carry out the responsibilities assigned to Executive, to the best of Executive's ability, in a diligent, trustworthy and businesslike manner for the purpose of advancing the Company.  Executive acknowledges that Executive's duties and responsibilities will require Executive's full-time business efforts and agrees that during the Employment Period, Executive will not engage in any outside business activities that conflict with his obligations under this Agreement.

    (b)    Term of Employment.  The term of Executive's employment under this Agreement will commence on the date of this Agreement and will continue until the third (3rd) anniversary of the date of this Agreement (the "Employment Period").  Notwithstanding anything to the contrary contained herein, the Employment Period is subject to termination pursuant to Section 6(d) below.

    (c)    Compensation.

        (i)    Salary.  During the Employment Period, the Company will pay the Executive a base salary (the "Annual Base Salary") of $200,000 per annum, less applicable tax withholding, subject to increase from time to time, solely at the Company Board's discretion, payable at the Company's regular employee payroll intervals.  The Executive's Annual Base Salary for any partial year will be prorated based upon the number of days elapsed in such year.

        (ii)    Bonus.  During the Employment Period, Executive shall be eligible to receive a cash bonus based upon the achievement of certain budgeted performance goals pursuant to a program approved by the Company Board and substantially similar to that set forth below (the "Performance Bonus") based upon the Company's annual budget (the "Budget").

| PERCENTAGE OF BUDGET | PERCENTAGE OF SALARY |
|---|---|
| 90%-94.9% | 10% |

CHI\1920625

6

| | |
|---|---|
| 95%-99.9% | 20% |
| 100% | 40% |
| 110% | 50% |
| 120% | 60% |
| 130% | 70% |
| 140% | 80% |
| 150% | 90% |
| 160% OR GREATER | 100% |

The Performance Bonus starts at 90% of Budget as indicated in the above table. Achievement of 90% to 99.9% of Budget pays the Executive as indicated in the above table without graduation. Achievement of 100% or greater of Budget pays the Executive as indicated in the above table and is graduated on a straight line basis so that for each percentage point that the Budget is exceeded, the Performance Bonus will be increased by one percentage point. By way of example, if the Company achieves 101% of Budget, then the Performance Bonus will equal 41% of the Annual Base Salary.

The Budget calculations will be conducted for each (A) EBITDA and (B) FCF. The EBITDA calculation will be factored by 66.7%. The FCF calculation will be factored by 33.3%. Notwithstanding the foregoing calculation and achievement of any Performance Bonus level, the Performance Bonus paid to the Executive (i) shall not exceed 15% of incremental EBITDA during the second year of this Agreement and (ii) shall not exceed 10% of incremental EBITDA during the third year of this Agreement and thereafter.

The Performance Bonus, if due to the Executive, shall be paid in one lump sum by the Company to the Executive within 30 days following the close of books.

(iii)    Benefits.  During the Employment Period, the Executive will be entitled to four weeks paid vacation, disability insurance, health insurance, and other benefits as are commensurate for similarly situated executives as determined from time to time by the Company Board.

CH\192062.5                                         7

      (iv)    <u>Automobile Allowance</u>. During the Employment Period, the Executive shall be paid a net amount equal to $500 monthly as and for expenses relating to the operation of an automobile for business use. Executive shall cause his automobile insurance policy to cover the Company as an additional insured for general liability insurance.

      (v)    <u>Education Loan</u>. If, as a result of termination by the Executive of his employment with Grainger, Executive is responsible for payment of that certain education loan made by Grainger to Executive (the "<u>Education Loan</u>") with respect to Executive's attendance at Kellogg School of Management, then the Company shall assume the Education Loan so long as Executive shall remain employed by the Company for a period of three years from the date of this Agreement. If, however, the Executive ceases to be employed by the Company prior to the three year anniversary of this Agreement, then the Company shall be responsible for that percentage of the Education Loan equal to the number of days that the Executive was employed by the Company divided by 1,095 (i.e., 365 days multiplied by 3 years) and the remaining balance of the Education Loan will be added to the outstanding principal balance of the Executive Note.

    (d)    <u>Termination</u>.

      (i)    <u>Termination Without Cause</u>. The Company may terminate the Employment Period without Cause upon thirty (30) days' prior written notice to the Executive. If the Executive's employment is terminated by the Company without Cause, then during the 12 month period commencing on the date of termination, the Company shall pay the Executive at a rate equal to the Executive's Annual Base Salary, payable in equal installments on the Company's regular salary payment dates (the "<u>Severance Payments</u>") and allow the Executive to continue participating in all of the Company's medical, disability and life insurance plans on the same basis as he was participating prior to termination (e.g., if his participation was at the Company's sole expenses prior to termination, it will be at the Company's sole expense during the severance period), but only to the extent permitted by the Company's insurance carriers at a cost not materially in excess of the Company's cost for such insurance immediately prior to the date of termination. In addition, at such time as the Performance Bonus which would otherwise have been payable to the Executive during such 12 month period would have been paid, the Company shall pay the Executive an amount equal to such Performance Bonus multiplied by a fraction where the numerator is the number of days the Executive was employed during the year in which he was terminated and where the denominator is 365.

      (ii)    <u>Death or Disability</u>. The Employment Period will terminate immediately upon the death of the Executive. The Company may terminate the Employment Period upon the Disability of the Executive. If the Executive's employment is terminated due to the Executive's death or Disability, then during the three month period commencing on the date of termination, the Company shall pay the Executive (or his estate) at a rate equal to the Executive's Annual Base salary, payable in equal installments on the Company's regular salary payment dates (the "<u>Severance Payments</u>") and, during the six month period commencing on the date of termination, allow the Executive, if disabled, to continue participating in all of the Company's medical,

CHI\192062.5

8

disability and life insurance plans on the same basis as he was participating prior to termination (e.g., if his participation was at the Company's sole expense prior to termination, it will be at the Company's sole expense during the severance period), but only to the extent permitted by the Company's insurance carriers at a cost not materially in excess of the Company's cost for such insurance immediately prior to the date of termination. In addition, at such time as the Performance Bonus which would otherwise have been payable to the Executive during the 12 month period immediately following the date of termination would have been paid, the Company shall pay the Executive an amount equal to 25% of such Performance Bonus multiplied by a fraction where the numerator is the number of days the Executive was employed during the year in which he was terminated and where the denominator is 365.

     (iii)   <u>Resignation</u>. The Executive may terminate the Employment Period at any time for any reason upon thirty (30) days' prior written notice to the Company. If the Executive's employment is terminated due to the Executive's resignation, then the Executive shall be entitled to receive his annual Base Salary through the date of termination. All of the Executive's rights to Annual Base Salary, Performance Bonus, and benefits hereunder which accrue or become payable after the date of such termination of the Employment Period shall cease upon such termination.

     (iv)   <u>Termination With Cause</u>. The Company may terminate the Employment Period immediately upon written notice to the Executive for Cause. If the Executive's employment is terminated by the Company with Cause, then the Executive shall be entitled to receive his Annual Base Salary through the date of termination. All of the Executive's rights to Annual Base Salary, Performance Bonus, and benefits hereunder which accrue or become payable after the date of such termination of the Employment Period shall cease upon such termination.

     7.   <u>Confidential Information</u>. The Executive acknowledges that the information, observations and data obtained by him during the course of his performance under this Agreement concerning the business and affairs of the Company and its Affiliates are the property of the Company, including information concerning acquisition opportunities in or reasonably related to the Company's business or industry of which the Executive becomes aware during the Employment Period and any period thereafter in which the Executive is receiving Severance Payments. Therefore, the Executive agrees that he will not disclose to any unauthorized person outside the ordinary course of business or use for his own account any of such information, observations or data without the Company Board's written consent, unless and to the extent that the aforementioned matters become generally known to and available for use by the public other than as a result of the Executive's acts or omissions to act. The Executive agrees to deliver to the Company at the termination of his employment, or at any other time the Company may request in writing, all memoranda, notes, plans, records, reports and other documents (and copies thereof) relating to the business of the Company and its Affiliates (including, without limitation, all acquisition prospects, lists and contact information) which he may then possess or have under his control.

     8.   <u>Noncompetition and Nonsolicitation</u>.

CHI\1920625

9

(a)    Noncompetition.  The Executive acknowledges that in the course of his employment with the Company he will become familiar with the Company's trade secrets and with other confidential information concerning the Company and that his services will be of special, unique and extraordinary value to the Company. Therefore, the Executive agrees that, during the Employment Period and for two years thereafter (the "Noncompete Period"), he shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business that manufactures, supplies or distributes lighting fixtures or decorative products and related items for sale and use primarily in recreational vehicles and the manufactured housing industry or otherwise competes with the businesses of the Company or its Affiliates or any businesses (each, a "Target Business") in which the Company or any of its Affiliates has entertained discussions or has requested and received information relating to the acquisition of such business by the Company or its Affiliates prior to the termination of the Executive's employment with the Company anywhere within the United States.

(b)    Nonsolicitation.  During the Employment Period and for two years thereafter, the Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee of the Company or any Affiliate to leave the employ of the Company or any Affiliate, or in any way interfere with the relationship between the Company or any Affiliate and any such employee thereof or (ii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company or any Affiliate to cease doing business with the Company or any Affiliate or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Affiliate.

(c)    Enforcement.  If, at the time of enforcement of Section 7 or 8 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law. Because the Executive's services are unique and because the Executive has access to confidential information, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement. Therefore, in the event a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without the necessity of posting a bond or other security).

## ARTICLE III

## GENERAL PROVISIONS

9.    Definitions.

"Affiliate" of any particular person or entity means any other person or entity controlling, controlled by or under common control with such particular person or entity.

CHI\192062.5

"Book Value" means, for any period, the book value of the Common Stock and Preferred Stock, as the case may be, as indicated on the Company's annual financial statements.

"Cause" means (i) the conviction of a felony or a crime involving moral turpitude or the commission of any act constituting dishonesty or fraud with respect to the Company or any of its Subsidiaries or any of their customers or suppliers, (ii) intentional conduct tending to bring the Company or any of its Subsidiaries into substantial public disgrace or disrepute, (iii) substantial and repeated material failure to perform duties of the office held by the Executive as reasonably directed by the Company Board, and such failure is not cured within 60 days after the Executive receives written notice thereof from the Company Board, (iv) recklessness or willful misconduct with respect to the Company or any of its Subsidiaries, or (v) any material breach of Section 7 or 8 of this Agreement.

"Disability" means the inability, due to illness, accident, injury, physical or mental incapacity or other disability, of the Executive to carry out effectively his duties and obligations to the Company or to participate effectively and actively in the management of the Company for a period of at least 90 days (whether or not consecutive) during any 180-day period, as determined in the reasonable judgment of the Company Board after receipt of competent medical advice.

"EBITDA" means, for any period, net income of the Company for such period plus, to the extent deducted in determining net income, interest expense, taxes, depreciation, amortization and other non-cash charges for such period to the extent deducted in determining the net income of the Company.

"Executive Stock" means all shares of Common Stock and Preferred Stock acquired by the Executive hereunder and all shares of Common Stock hereafter acquired by Executive by exercise of stock options pursuant to the Stock Option Agreement. "Executive Stock" will continue to be Executive Stock in the hands of any holder other than the Executive (except for the Parent and Mesirow and except for transferees in a Public Sale), and except as otherwise provided herein, each such other holder of Executive Stock will succeed to all rights and obligations attributable to the Executive as a holder of Executive Stock hereunder. Executive Stock will also include shares of the Parent's capital stock issued with respect to Executive Stock by way of a stock split, stock dividend or other recapitalization.

"Fair Market Value" of each share of Executive Stock means the fair value of such the Executive Stock determined in good faith by the Parent Board, taking into account all relevant factors determinative of value (including the lack of liquidity of such securities due to the Parent's status as a privately held corporation, but without regard to any discounts for minority interests). If the Executive reasonably disagrees with such determination, the Parent Board and the Executive will negotiate in good faith to agree on such Fair Market Value. If such agreement is not reached within 30 days after the delivery of the Repurchase Notice or the Supplemental Repurchase Notice, Fair Market Value shall be determined by an appraiser jointly selected by the Parent Board and the Executive, which appraiser shall submit to the Parent Board and the Executive a report within 30 days of its engagement setting forth such determination. If the parties are unable to agree on an appraiser within 45 days after delivery of the Repurchase Notice or the Supplemental Repurchase Notice, within seven days, each party shall submit the

names of four nationally recognized investment banking firms, and each party shall be entitled to strike two names from the other party's list of firms, and the appraiser shall be selected by lot from the remaining four investment banking firms. The expenses of such appraiser shall be borne by the Executive unless the appraiser's valuation is greater than 110% of the amount determined by the Parent Board, in which case, the costs of the appraiser shall be borne by the Parent. The determination of such appraiser shall be final and binding upon all parties. If the Repurchase Option is exercised within 90 days after a Termination, then Fair Market Value shall be determined as of the date of such Termination; thereafter, Fair Market Value shall be determined as of the date the Repurchase Option is exercised.

"Family Group" means the Executive's spouse, the Executive's descendants (whether natural or adopted), the Executive's spouse's descendants (whether natural or adopted), and any trust, retirement plan, family limited partnership or other entity solely for the benefit of the Executive and/or any of the foregoing Persons.

"FCF" means, for any period, cash available to the Company after giving effect to any obligations or indebtedness owed by the Company.

"Original Cost" means (a) with respect to each share of Common Stock purchased hereunder, $1 (as proportionately adjusted for all subsequent stock splits, stock dividends and other recapitalizations) and (b) with respect to each share of Preferred Stock purchased hereunder, $100, plus 8% per annum on such amount calculated from the date on which such share of Preferred Stock was purchased hereunder, compounded annually.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Offering" means the sale in an underwritten public offering registered under the Securities Act of shares of the Parent's Common Stock approved by the Parent Board.

"Public Sale" means any sale pursuant to a registered public offering under the Securities Act or any sale to the public pursuant to Rule 144 promulgated under the Securities Act effected through a broker, dealer or market maker.

"Sale of the Parent" means (i) any sale, transfer or issuance or series of sales, transfers and/or issuances of capital stock of the Parent or any holders thereof (by merger or otherwise) which results in any Person or group of Persons (as the term "group" is used under the Securities Exchange Act), other than any Person (or Affiliate thereof) who is a stockholder as of January___, 2005, owning a majority of the issued and outstanding Common Stock (on a fully diluted basis), and (ii) any sale or transfer of all or substantially all of the assets of the Parent and its Subsidiaries (by merger or otherwise) in any transaction or series of transactions (other than sales in the ordinary course of business); provided that the term "Sale of the Parent" shall not include a Public Offering.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Stock Option Agreement" means any stock option agreement adopted by the Parent pursuant to which options to purchase Common Stock are granted to employees of the Company.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, mangers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at that time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"Transfer" means to sell, transfer, assign, pledge or otherwise dispose of (whether with or without consideration and whether voluntarily or involuntarily or by operation of law).

    10.    Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally or by facsimile transmission to the recipient, sent to the recipient by reputable express courier service (charges prepaid) or mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Such notices, demands and other communications shall be sent to the Parent, the Company, the Executive and Mesirow at the address indicated below:

<u>If to the Parent, the Company or Mesirow:</u>

c/o Mesirow Private Equity Investments, Inc.
350 North Clark Street
Chicago, Illinois 60610
Facsimile: (312) 595-6211
Attention: Daniel Howell and Joshua Daitch


<u>with a copy to:</u>

Duane Morris LLP
227 West Monroe Street, Suite 3400
Chicago, Illinois 60606
Facsimile: (312) 499-6701
Attention: David J. Kaufman

<u>If to the Executive:</u>

Jeffrey Nixon
1175 North Museum Blvd. #517
Vernon Hills, Illinois 60061

or to such other address or to the attention of such other person as the recipient party has
specified by prior written notice to the sending party.

11.    Underline{General Provisions}.

(a)    Underline{Transfers in Violation of Agreement}. Any Transfer or attempted Transfer
of any Executive Stock in violation of any provision of this Agreement shall be void, and the
Company shall not record such Transfer on its books or treat any purported transferee of such
stock for any purpose.

(b)    Underline{Severability}. Whenever possible, each provision of this Agreement will
be interpreted in such manner as to be effective and valid under applicable law, but if any
provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under
any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will
not affect any other provision or any other jurisdiction, but this Agreement will be reformed,
construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision
had never been contained herein.

(c)    Underline{Complete Agreement}. This Agreement, those documents expressly
referred to herein and other documents of even date herewith embody the complete agreement
and understanding among the parties and supersede and preempt any prior understandings,
agreements or representations by or among the parties, written or oral, which may have related to
the subject matter hereof in any way.

(d)    Underline{Counterparts}. This Agreement may be executed in separate counterparts,
each of which is deemed to be an original and all of which taken together constitute one and the
same agreement. A signed facsimile shall constitute an original for all purposes.

(e)    Underline{Successors and Assigns}. Except as otherwise provided herein, this
Agreement shall bind and inure to the benefit of and be enforceable by the Executive, the
Company, the Parent and Mesirow and their respective successors and assigns (including
subsequent holders of Executive Stock); provided that the rights and obligations of the Executive
under this Agreement shall not be assignable except in connection with a permitted transfer of
executive Stock hereunder.

(f)    Underline{Choice of Law}. The corporate law of the State of Delaware will govern
all questions concerning the relative rights of the Company and its stockholders. All other
questions concerning the construction, validity and interpretation of this Agreement and the
exhibits hereto will be governed by and construed in accordance with the internal laws of the
State of Illinois, without giving effect to any choice of law or conflict of law provision or rule
(whether of the State of Illinois or any other jurisdiction) that would cause the application of the
laws of any jurisdiction other than the State of Illinois.

CHI\192062.5                                14

(g)     _Remedies_.  Each of the parties to this Agreement (including Mesirow, as a beneficiary of this Agreement) will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(h)     _Amendment and Waiver_.  The provisions of this Agreement may be amended and waived only with the prior written consent of the Company, the Parent, the Executive and Mesirow.

(i)     _Business Days_.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or holiday in the state in which the Company's chief executive office is located, the time period shall be automatically extended to the business day immediately following such Saturday, Sunday or holiday.

*  *  *  *  *

CHI91902062.5                                15

      IN WITNESS WHEREOF, the parties hereto have executed this Senior Management agreement on the date first written above.

R.B. Gustafson Company

By: _____
Its: Secretary

Gustafson Holdings Corp.
By: _____
Its: President

_____
Jeffrey Nixon

Agreed and Accepted:

Mesirow Capital Partners VIII, L.P.

By: Mesirow Financial Services, Inc.

By: _____
Its: _____

Exhibit C

*Name Searched On:*
**R.B. GUSTAFSON COMPANY (Legal)**

**Current Information**

*Entity Legal Name:*
**R. B. GUSTAFSON COMPANY**

*Entity Address:*
**57766 CO RD 3 S, ELKHART, IN 46517**

**General Entity Information:**

Control Number: **1995010185**
Status: **Active**
Entity Type: **For-Profit Domestic Corporation**

Entity Creation Date: **1/5/1995**
Entity Date to Expire:
Entity Inactive Date:

**This entity is current with Business Entity Report(s).**

**Other Names for this Entity:**

| Date | Name (Type) |
|------|-------------|
| 1/5/1995 | GUSTAFSON LIGHTING  (Assumed / Elkhart County ) |

**Additional Services Available:**

| | |
|---|---|
| [GO] | **View additional information for the entity**, including **transaction history, merger information, registered agent, principals and corporate report information (years paid and years due)**. There is a fee of $1.00 for *accessIndiana* subscribers and a fee of $2.04 for credit card users for this additional information. NOTE: Amendments filed prior to 1987 DO NOT appear in the transaction history. |
| [GO] | **Generate an official Certificate of Existence/Authorization.** There is a total fee of $20.00 for *accessIndiana* subscribers and a fee of $21.42 for credit card users. Example Certificate. Please note that when an entity has a past due business entity report, the Certificate of Existence will indicate that the entity is not current. An entity is current if no reports are past due. |

Exhibit D



HOME | PRODUCTS | CAREERS | CONTACT US | SITE MAP

Our Mission | Quality Statement | Company



## COMPANY HISTORY

The R.B. Gustafson Company entered the lighting industry in 1962 when Bob Gustafson began providing light fixtures to the RV industry. After joining the company in 1970, Charlie Gustafson and his father formed The R.B. Gustafson Company and over the next ten years expanded their product lines to better serve a growing RV market.

A milestone was reached in 1981 when the company acquired its first production facility in Elkhart, Indiana and started designing and building its own custom-made fixtures that reflected individual customer tastes. A second facility was purchased in 1989 to accommodate further lamp and fixture production.

In 1992, Gustafson showed its leadership position in creativity and design once again by co-developing fluorescent lights specifically for the RV industry. The Company's commitment to quality was recognized in 2001 when The R.B. Gustafson Company achieved ISO 9001-1994 certification and recertified its commitment in 2003 with ISO 9001-2001 certification.

Through years of product innovation, sound management and great attention paid to customer needs, The R.B. Gustafson Company has become the leader in providing lighting products to the RV and manufactured housing industries. We are poised for growth in an industry that is itself growing and we look forward to becoming a part of your company's success.

Warranty Policy | Privacy Statement | Contact Us | Sitemap

Copyright © 2007. Gustafso Lighting



Our Mission | Quality Statement | Company

| HOME | PRODUCTS | CAREERS | CONTACT US | SITE MAP |



## CONTACT INFORMATION

If you are a distributor or original equipment manufacturer, please contact us at:

The R.B. Gustafson Company
57766 C.R. 3 South
Elkhart, IN 46517
Phone: (574)522-0871
Fax: (574)522-4529
Contact: cindyc@guslighting.com

Because we are a business-to-business company, retail customers should contact their local dealer or distributor for product details and availability.

Warranty Policy | Privacy Statement | Contact Us | Sitemap

Copyright © 2007. Gustafso Lighting

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY NIXON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 CV 1391 |
| v. | ) | |
| | ) | Judge Der-Yeghiayan |
| R.B. GUSTAFSON COMPANY, | ) | |
| | ) | Magistrate Judge Ashman |
| Defendant. | ) | |

<u>**Declaration of James C. Vlahakis**</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that to the best of my knowledge, information and belief, that the following statements are true and correct:

1.    I am counsel of record for Defendant, R.B. GUSTAFSON COMPANY.

2.    For the relevant time period of the Complaint in this action, 2005 through the present, Defendant was and is and Indiana corporation with a principal place of business in Elkhart, Indiana.


<u>/s/ James C. Vlahakis</u>
James C. Vlahakis
Hinshaw & Culbertson LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601
 (312) 704-3715
<u>jvlahakis@hinshawlaw.com</u>
Attorney for Defendant

2